UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KIM THOMPSON,

       Plaintiff,

                                 File No.  1:04-CV-339

v.

                                 HON. ROBERT HOLMES BELL

ARAMARK SCHOOL SUPPORT
SERVICES, INC.,

       Defendant.

_____/

**O P I N I O N**

      This matter arises out of the employment termination of Plaintiff Kim Thompson from her position with Defendant Aramark School Support Services.  Plaintiff contends that she was terminated in retaliation for comments made to the Benton Harbor School Board regarding unsanitary conditions in the Benton Harbor High School food service department. Plaintiff alleges that her termination violated Michigan's Whistleblower Protection Act, MICH. COMP. LAWS §§ 15.361-369.  Before the Court is Aramark's motion for summary judgment.  Because Plaintiff has failed to demonstrate a causal connection between her speeches before the school board and her subsequent dismissal, Aramark's motion for summary judgment is granted.  *See West v. General Motors Corp.*, 469 Mich. 177, 184, 665 N.W.2d 468, 472 (2003).

I.

Aramark manages the Benton Harbor School District's food service program in a particularly challenging environment.  The main food service operation is centered at the Benton Harbor High School.  Unfortunately, due to the high school's proximity to a former landfill area, the high school administrators and Aramark have been forced to constantly combat the entrance of mice into the facility, including the food service area.  The parties do not dispute that the rodent problem was well-known to Aramark, the Benton Harbor School District facility manager and superintendent, and the Berrien County Health Department.  This persistent, on-going problem has required the use of frequent pest control measures, consistent monitoring and reporting by employees, and constant oversight by the county health inspector.

Plaintiff began her employment in the food service department of the Benton Harbor School District in 1995.  During her employment, Plaintiff worked as a fry cook and cart loader.  In her position as a cart loader, Plaintiff was responsible for loading carts with food for delivery to the other satellite schools in the school district.  She was also responsible for inspecting each bread rack for signs of mice contamination.  In the event that Plaintiff found evidence of contamination, she was trained to determine if the bread needed to be disposed of and to immediately notify her supervisor.  Thompson Dep. at 242-43, Exhibit K-1, Def.'s Br. Summ. J. (Docket #59).  As a fry cook, Plaintiff's responsibilities included preparing food for the school lunch program, cleaning the fry area, and properly storing food and

2

ingredients.  In both of her positions, Plaintiff understood that if she discovered an unsanitary condition or determined that food was not edible or safe, she was to immediately notify her supervisor.  *Id*. at 231.

According to Plaintiff, although the rodent problem persisted throughout her tenure, conditions worsened in 2003.  While she frequently complained about the conditions to her supervisors, the mice problem continued to persist.  On August 27, 2003, Plaintiff, along with two co-workers attempted to meet with the school district superintendent.  According to Plaintiff, she went to the meeting to address her concerns regarding the food service conditions.  Thompson Dep. at 305, Exhibit K-2, Def.'s Br. Summ. J.  Plaintiff was rebuffed by the superintendent's secretary and informed that she needed to address her concerns to Aramark, not the superintendent, because she was an Aramark employee.  *Id*. at 305-07.  In response to this incident, A.J. Haynes, Aramark's food service director, circulated a memo reminding Aramark employees that in the event they had a complaint they were to address it with their immediate Aramark supervisor.  Exhibit 18, Thompson Dep., Exhibit K-3, Def.'s Br. Summ. J.

Plaintiff did not take any further action regarding her concerns until December 9, 2003, when she began secretly photographing the conditions in the food service area.  Plaintiff then took pictures on seven subsequent dates, February 6, 13, 17, and 24, 2004; and March 4, 12, and 17, 2004.  She did not tell anyone that she was taking the pictures and attempted to hide from other's view while taking them.  *Id*. at 338, 350-51.  Although she

began developing the pictures in February 2004, she did not publicly disclose the photographs until March 9, 2004, at a community meeting in which she announced her candidacy for the school board.

Also on December 9, 2003, Plaintiff made her first of three appearances before the school board. These appearances are at the center of Plaintiff's whistleblower claim. During the public comment portion of the meeting, Plaintiff made the following speech:[1]

> Tonight I am not wearing my Aramark logo. I am not at central administration ready to pose some issues to the superintendent and assistant superintendent. We have gotten to the point where we are right now by [sic] ignoring history. You did not generate the problem Ms. Donley. You just inherited it. Tonight I'm going to put my job on the line because I'm tired because I'm also a parent. We have shuffled around the kitchen. We have a walk-in refrigerator that we have had mice go into. We've had to [unintelligible] the food. We've been ignored every time we want to try to talk to someone. That's not right to our children because they have to eat the food. I've been told by [the] assistant food service director that the state allows I believe it is $2.12 per child and Aramark is only spending half of that. We want to know why we are the only district in the whole county that seems to be suffering the most. Also, I have a couple of other questions. I would like to know do you the board members along with central administration have to possess a certain amount of integrity in order to serve this community because if so, I would like to know why the food service department was left out of the district in 1999. Also in addressing a statement you have made a number of times Mr. Henry, that the district doesn't have to provide food for these students, that's true. I do want to say this, rather than Aramark continue to feed our children would it be better that you not feed them at all?

---

[1]Defendant has provided audiotapes of Plaintiff's three speeches to the school board. *See* Exhibits Q, R, Def.'s Br. Summ. J. Plaintiff has also produced a tape of her February and March speeches. Exhibit J., Pl.'s Res. Br. (Docket #64). The Court has reviewed the tapes in the preparation of this opinion. The text of the speeches is gleaned from the recordings provided to the Court.

Exhibit Q, Dec. 9, 2003 Speech, Def.'s Br. Summ. J.  Following the December 9, 2003 school board meeting, Haynes met with Plaintiff to discuss her allegations.  Food service worker Isabel Ash also attended the meeting.  Ash Dep. at 14, Exhibit J, Def.'s Br. Summ. J.  During this meeting, Plaintiff was reminded that, as an Aramark employee, she was required to bring any food service problem to the attention of her supervisors.  *Id*. at 18.  Plaintiff, however, explained that, in her view, her comments at the school board meeting did not have anything to do with her employment.  Thompson Dep. at 371.  Haynes agreed that she could voice her opinion at the school board meeting, but had to notify her supervisors of any problem in the food service area.  Haynes Dep. at 115-16, Ash at 18.  Plaintiff also received a verbal reprimand, the first stage in Aramark's progressive employee discipline program.[2]

Following the meeting, Plaintiff filed a statement of concern with the Michigan Department of Civil Rights regarding the verbal reprimand.  Curiously, Plaintiff characterized her complaint as: "I, a Black woman who protested the privatization of my job allege I was disciplined on December 16, 2003, because of my race and in retaliation for having complained about the privatization of my job." Exhibit 24, Thompson Dep., Exhibit K-3, Def.'s Br. Summ. J.  The Michigan Department of Civil Rights did not file a formal complaint because Plaintiff failed to provide sufficient grounds to show that the alleged retaliation was based on a protected status.  *Id*.

---

[2]The parties dispute whether Haynes threatened to fire Plaintiff.  Plaintiff alleges that Haynes prevented her from leaving the meeting and made reference to firing her.  Thompson Dep. at 362-63.  Both Haynes and Ash deny that this occurred.

On February 3, 2004, Plaintiff again appeared before the school board, making the

following comments:

> I'm here tonight because I recognize that myself along with a number
> of other participants were not acknowledged as public participants in Volume
> 3 of Benton Harbor Area Schools Progressive regarding the December 9, 2003
> board meeting.  On that night I stated that we have to shuffle food because of
> mice contamination.  The point I was trying to make is that we have had a lot
> of food replaced because of the mice or even make do with what we have.  I
> also stated that the former assistant food service director brought to my
> attention that the state provides about $2.17 per child per meal but Aramark
> spends about half or less than half of that.  I also asked did one have to possess
> a certain amount of integrity to be a board member and last I asked rather than
> Aramark feed our children would you consider not feeding them at all.  And
> that's when I put my job on the line.  Exactly one week later, December 16,
> Director A.J. Haynes called me into a meeting and I guess he was going to fire
> me for what I stated at this public meeting.  This is public schools.  And I feel
> that our children are being discriminated against.   Any time you have
> unsanitary conditions back there in the kitchen and they can care less – I mean
> mice droppings lay around over the food or spices -- you name it and they're
> using the stuff every day.  No one seems to pay attention.  When I brought that
> to the board's attention that night and I'm very upset about it.  So he had me in
> that meeting and was steady making threats to fire me.  I requested that I leave
> the meeting because it had no bearing on what [sic] because I made it known
> at the board meeting on December 9.  But he refused to let me go.  He held me
> there against my will.  I requested to leave a number of times and I just want
> you all to know that.  I missed something that I wanted to say earlier and that
> was relating to the food which we also re-serve food every day on a daily
> basis.  We serve reused food on a daily basis food that has been handled
> previous from a day or two.  I also wanted to say concerning [the] December 9
> board meeting I left out a statement that I made which was relating to integrity
> of board members – I asked, why did you leave us out of the district in 1999?

Exhibit R, Feb. 3, 2004 Speech, Def.'s Br. Summ. J.  Once again, Haynes and Plaintiff met

to discuss her actions.[3]  At this meeting, Plaintiff received a written reprimand explaining

---

[3]This second meeting was transcribed and is attached to Plaintiff's response brief.  *See*
Exhibit L, Pl.'s Res. Br.

that she was acting in an unbecoming manner as an Aramark employee.  Exhibit I, Final
Written Warning Memorandum, Pl.'s Res. Br. (Docket #64).  The reprimand described her
comments at the December 9, 2003 and February 3, 2004 school board meetings as
"offensive" and warned Plaintiff that continued unbecoming conduct would result in further
disciplinary action, including possible termination.  *Id*.  Attached to the written reprimand
was a school district conflict of interest policy.  Exhibit 29, attached to Exhibit K-3, Def.'s
Br. Summ. J.  Haynes explained that this policy was included with the reprimand because he
was concerned about Plaintiff's motive for going to the school board meetings.  Haynes Dep.
at 118, Exhibit A, Def.'s Br. Summ. J.  At the second meeting between Haynes and Plaintiff,
the written reprimand was read to Plaintiff.  Exhibit L, Pl.'s Res. Br.  Haynes also reminded
Plaintiff that she was not complying with Aramark protocol for addressing food service area
concerns.  *Id*.  The meeting concluded because Plaintiff refused to speak.  *Id*.

Plaintiff addressed the Benton Harbor School Board for the final time on March 2,
2004, making the following speech:

> First of all, I would like a copy of [the] February 3, 2004 School Board
> minutes which includes comments that I made that evening.  I received a letter
> from my supervisor A.J. Haynes that stated that two school board members
> came to him.  The letter stated that I acted in a manner that was unbecoming
> in conduct.  I would like to know who the two school board members were and
> their definition of unbecoming conduct.  I would like an answer within 24
> hours via Benton Harbor School district mail.  I brought you all issues on
> December 9, 2003 and February 3, 2004 concerning rat droppings in and on
> our food products and on February 3, 2004 the use of leftover food to feed the
> students of our school district.  I don't believe you all understand how this
> political system works.  Let me see if I can explain.  You are all elected as
> servants for the people who live in the school district.  Rather than go around

intimidating people on their job it is your duty to serve the people who live in the school district.

Exhibit R, March 2, 2004 Speech, Def.'s Br. Summ. J.  A week after this school board meeting, on March 9, 2004, Plaintiff attended a community meeting where she announced her candidacy for school board.  Exhibit N, Hunt-Redd Aff.  ¶¶ 8-13.  Plaintiff also distributed, for the first time, the pictures of the food service area that she had taken during the previous three months.  *Id*. at ¶¶ 10-12.  Following the meeting, Aramark received copies of the pictures.  *Id*. at ¶ 15.  Thereafter, Aramark suspended Plaintiff pending an investigation.  According to Plaintiff, when she was suspended she understood that the punishment was due to the photographs of the food service area.  Thompson Dep. at 493, 495, Exhibit K-2, Def.'s Br. Summ. J.  In a letter dated March 29, 2004, Aramark further explained the reason for Plaintiff's suspension: "breaking company protocol and requirement for alerting, addressing, and attending to developments in any matters affecting company business," as well as, "breaking company protocol and requirement for alerting, addressing, and attending to developments in any matters [sic] your performance within a union." Exhibit P, Pl.'s Res. Br.  Haynes explained that the company protocol that Plaintiff violated was the failure to alert Aramark staff "of any situations in the cafeteria, especially with the rodent infestation."  Haynes Dep. at 158, Exhibit A, Def.'s Br. Summ. J.  Haynes further explained that she also violated company protocol by failing to notify management of a "hazardous situation that only she knew about . . . as far as feces being in the food."  *Id*. at 160.  On April 12, 2004, Plaintiff was terminated.

8

Also relevant to this case is a dispute between Plaintiff, Aramark and the unions representing the food service employees stemming from the privatization of the food service employees. Until 2001, Aramark only employed the food service management team, while the hourly employees were employed by the school district. In 2001, however, Benton Harbor decided to privatize the food service workers by outsourcing them to Aramark. Thus, the employees, including Plaintiff, became Aramark employees. At the time of the privatization, Plaintiff was an officer of MEA, the union representing the food service employees. Thompson Dep. at 250. Plaintiff was very unhappy about the privatization decision and felt betrayed by the union. Plaintiff expressed her displeasure regarding the privatization decision at a July 3, 2001 school board meeting. *Id*. at 272.

Following the privatization, Aramark and MEA began negotiating a new collective bargaining agreement. The agreement included a provision allowing senior employees to retire, obtain pension benefits from the Benton Harbor School District, yet maintain their seniority during their employment with Aramark. *Id*. at 254-55. This arrangement prevented employees, such as Plaintiff, from receiving better employment positions and the opportunity for overtime work. Plaintiff was opposed to this arrangement and led a campaign to replace MEA with a new union, AFSCME. *Id*. at 252.

Plaintiff's campaign was successful and she became the contact person for AFSCME. *Id*. at 284. Despite her successful efforts to bring in a new union, AFSCME negotiated the same seniority provision contained in the MEA collective bargaining agreement. *Id*. at

9

303-04.  This turn of events humiliated Plaintiff and resulted in her feeling badgered by co-workers who held her responsible for AFSCME's failure to rectify the seniority issue.  *Id*. at 303.  Ultimately, Plaintiff led another campaign seeking to decertify AFSCME.  This effort, however, was unsuccessful.  *Id*. at 447.  Finally, Plaintiff also filed an age discrimination claim against AFSCME with the Michigan Department of Civil Rights encompassing the seniority issues.  The Michigan Department of Civil Rights notified Plaintiff that the actions of AFSCME did not constitute age discrimination under Michigan civil rights laws.  Exhibit 23, Thompson Dep., Def.'s Br. Summ. J.

## II.

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005).  The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor

of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the non-moving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the facts are viewed in the light most favorable to the non-movant, they may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *Daniel v. Cantrell*, 375 F.3d 377, 381 (6th Cir. 2004). "A mere scintilla of evidence is insufficient." *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004). Rather, a party with the burden of proof opposing a motion for summary judgment has the burden to come forth with requisite proof to support his legal claim, particularly where he has had an opportunity to conduct discovery. *See Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001).

III.

Plaintiff contends that Aramark's actions violated the Michigan Whistleblowers' Protection Act, MICH. COMP. LAWS §§ 15.361 – .369. Section 15.362 of the Whistleblowers' Protection Act provides in pertinent part:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employees' compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or

11

because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

MICH. COMP. LAWS § 15.362. A "public body" is defined as, *inter alia*, "[a] county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof." MICH. COMP. LAWS § 15.361(d)(iii). The parties do not dispute that the Benton Harbor School Board is a "public body" within the meaning of the statute.

Michigan courts have interpreted the Whistleblowers' Protection Act to cover two types of whistleblowers. *Deneau v. Manor Care, Inc.*, 219 F. Supp. 2d 855, 860 (E.D. Mich. 2002) (citing *Henry v. City of Detroit*, 234 Mich. App. 405, 594 N.W.2d 107 (1999).

> A 'Type 1 Whistleblower' is one who, on her own initiative, takes it upon herself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. 'Type 2 Whistleblowers' are those who participate in a previously initiated investigation or hearing at the behest of a public body.

*Id.* at 860-61 (citations omitted). In this case, it is undisputed that Plaintiff is a "Type 1 Whistleblower." Whether a plaintiff is classified as a Type 1 or 2 whistleblower, in order to establish a prima facie case, plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the Whistleblowers' Protection Act, 2) the plaintiff was discharged, and 3) a causal connection existed between the protected activity and the discharge. *West*, 469 Mich. at 183-84, 665 N.W.2d at 471-72; *Shallal v. Catholic Social*

12

*Services of Wayne County*, 455 Mich. 604, 610, 566 N.W.2d 571, 574 (1997).  Obviously, the second prong of the prima facie case is not in dispute because Plaintiff was discharged on April 12, 2004.  Accordingly, Plaintiff must show that she engaged in protected activity and that this activity was casually connected to her discharge.  If Plaintiff establishes a prima facie case, the burden shifts to Aramark to articulate a legitimate non-retaliatory reason for the termination.  *James v. HRP, Inc.*, 852 F. Supp. 620, 626 (W.D. Mich. 1994) (McKeague, J.); *Taylor v. Modern Eng'g, Inc.*, 252 Mich. App. 655, 659, 653 N.W.2d 625, 628 (2002).  If Aramark shows the existence of a legitimate reason for the discharge, Plaintiff then may prove that the articulated reason was only a pretext for the discharge.  *Taylor*, 252 Mich. App. at 659, 653 N.W.2d at 628.  Plaintiff may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Deneau*, 219 F. Supp. 2d at 860 (quoting *Phinney v. Perlmutter*, 222 Mich. App. 513, 563, 564 N.W.2d 532, 558 (1997)).

The Court will first address the "protected activity" prong of the prima facie case.  An employee engages in "protected activity" under the Whistleblowers' Protection Act when she reports, or is about to report, a suspected violation of law to a public body.  *Shallal*, 455 Mich. at 610, 566 N.W.2d at 575.  In this case, Plaintiff contends that she engaged in protected activity by reporting the mice contamination and serving of leftover food in the food service area to the Benton Harbor School Board.  A strong argument can be made that

Plaintiff did not engage in protected activity by speaking to the school board. A review of the evidence in the record reveals at least three primary impediments to concluding that Plaintiff engaged in protected activity.

First, in order to be considered a "Type 1 Whistleblower," the employee must reveal an "as yet hidden" violation of law. *Deneau*, 219 F. Supp. 2d at 860-61, *Henry*, 234 Mich. App. at 410, 594 N.W.2d at 110. There is a significant amount of evidence in the record demonstrating that the rodent infestation problem was well known to Aramark, the school administrators, and the county health department. *See, e.g.*, Haynes Dep. at 79-82, Exhibit A, Pl.'s Res. Br.; Hunt Dep. at 34-36, Exhibit C, Def.'s Br. Summ. J.; Mitchell Aff. ¶¶ 3-6, Exhibit E, Def.'s Br. Summ. J., Bowman Dep. at 25-26, Exhibit D, Def.'s Br. Summ. J., London Dep. at 115-16, 119-20, Exhibit G, Def.'s Summ. J. For example, Berrien County health inspector David London testified that he maintained an open and cooperative relationship with the Aramark staff and believed that proper measures were being taken to alleviate the presence of rodents. London Dep. at 115-16, 126. London also explained that, given the nature of rodents, the goal in pest control is to minimize the presence of rodents, recognizing that complete eradication is nearly impossible. *Id*. at 96. Moreover, the high school operations and facilities manager explained that he was well aware of the rodent problem, had shared this information with the superintendent, and had taken "all actions possible" to control the problem. Mitchell Aff. ¶¶ 3-5, Exhibit E, Def.'s Br. Summ. J. This evidence tends to support the conclusion, urged by Aramark, that Plaintiff's speeches to the

14

school board did not reveal a hidden legal violation, and consequently did not constitute "protected activity" under the Whistleblower Protection Act.

The Court, however, has also been presented with evidence tending to show that the school board was unaware of the mice problem until Plaintiff revealed the problem at the December 9, 2003 school board meeting. School board member Jolita Allene Smith testified that she first learned of the rodent infestation in the food service area when Plaintiff spoke to the school board. Smith Dep. at 21, Exhibit X, Pl.'s Res. Br. (Docket #66). Smith explained that the members of the board "were all sitting there in shock" during Plaintiff's speech. *Id*. This evidence provides some support for Plaintiff's position that she revealed a suspected violation of law that was unknown to the school board.

Second, in order to be considered "protected activity," Plaintiff's primary motivation "must be a desire to inform the public on matters of public concern, and not personal vindictiveness." *Shallal*, 455 Mich. at 621, 566 N.W.2d at 579 (quoting *Wolcott v. Champion Int'l Corp.*, 691 F. Supp. 1052, 1065 (W.D. Mich. 1987) (Miles, S.J.). "Those availing themselves of [the statute's] protection should be motivated, at least in part, by a desire to inform the public about violations of laws and statutes, as a service to the public as a whole." *Wolcott*, 691 F. Supp. at 1059. Plaintiff contends that she was motivated by her concern for the health and safety of the school children, particularly because she was a parent of students attending the high school. *See e.g.*, Thompson Dep. at 368-69, 371. While Plaintiff's stated motivation certainly evidences an altruistic concern, it cannot be viewed in

15

isolation.  Rather, it must be considered in light of the surrounding circumstances of her employment.  Particularly, her active resistance to Aramark and employee privatization as well as the timing of her actions with her candidacy for school board.

The undisputed evidence shows that Plaintiff was opposed to the privatization of the food service employees and engaged in active resistance against the unions representing Aramark employees.  *See* Thompson Dep. at 252, 272, 447 and Exhibit 23, Exhibits K-1, 2, and 3, Def.'s Br. Summ. J.  Plaintiff also acknowledges that she was aware of the unsanitary conditions in the food service area as early as March 2003 when she obtained a written complaint detailing the unsanitary conditions from her co-worker, Annette Ward.  *Id*. at 297-300, Exhibit K-1, Def.'s Br. Summ. J.[4]  She also acknowledges that in August 2003 she attempted to speak to the Benton Harbor superintendent regarding the conditions in the food service area.   *Id*. at 305-07.  Finally, the evidence also shows that after attempting to speak to the superintendent, Plaintiff did not take any further action until December 2003 when she began speaking to the school board and secretly photographing the food service area.  Thus, although she was aware of the allegedly unsanitary condition of the food service area as early as March 2003, she did not take any action until August 2003.  After August 2003, she did not take any action until December 2003.  This inactivity coupled with her continual resistance to Aramark and the union representation casts her motive in a suspicious light.

_____

[4]Plaintiff received this complaint because she and others were contemplating filing an unfair labor practices lawsuit.  Thompson Dep. at 300, 303, Exhibit K-1, Def.'s Br. Summ. J.

Third, a review of Plaintiff's speeches before the school board demonstrates that each appearance was much more than an expression of concern regarding food service conditions. To the contrary, during each appearance Plaintiff made wide ranging allegations including that Aramark mismanaged funds.  In addition, at each appearance Plaintiff also consistently mentioned her continued disagreement with the decision to privatize the food service employees.  Further, Plaintiff's own contemporaneous characterization of her December 2003 school board appearance and subsequent discipline supports the conclusion that her appearances were not motivated by a desire to inform the public about a violation of law. Following her initial disciplinary meeting with Aramark, Plaintiff filed a complaint with the Michigan Department of Civil Rights alleging that she was disciplined because of her race and in retaliation for "complain[ing] about the privatization of my job."  Exhibit 24, Exhibit K-3, Def.'s Br. Summ. J.

Finally, Plaintiff's surreptitious photographing of the food service area also indicates that she may have had a personal motive for her actions.  Particularly when coupled with the fact that she did not reveal any of these photographs to the school board, despite the fact that she appeared before the board after taking the pictures, and did not publicly reveal the photographs until the community meeting announcing her candidacy for school board. Plaintiff's active resistance to privatization, her inactivity regarding the unsanitary conditions, and her use of the photographs of the food service area in connection with her candidacy for school board create a high level of suspicion regarding her stated, altruistic motive.

17

Despite the potential shortcomings of Plaintiff's case outlined above, it is not necessary for the Court to determine as a matter of law whether Plaintiff's actions constitute "protected activity" because, even assuming that she engaged in protected activity, she has failed to demonstrate the required causal connection between her actions and subsequent employment dismissal.

As stated previously, in order to establish a claim under the Whistleblowers' Protection Act, Plaintiff must show a causal connection between the protected activity and the employment termination. *West*, 469 Mich. at 184, 665 N.W.2d at 471-72; *James*, 852 F. Supp. at 625-26. That is, a plaintiff must demonstrate that the employer took "adverse employment action *because of* plaintiff's protected activity." *Id*. at 185, 665 N.W.2d at 472 (emphasis in original). In this case, based upon the undisputed evidence before the Court, Plaintiff has failed as a matter of law to establish a causal connection between her actions and subsequent dismissal. Accordingly, Aramark is entitled to summary judgment on her claim.

It is clear from the evidence that Plaintiff understood that part of her employment included a duty to report unsanitary conditions in the food service area to her supervisors. Thompson Dep. at 231, 242-43. This employment duty is also evident from the testimony of Plaintiff's Aramark co-workers. Isabel Ash explained that when she saw mice in the food service area she immediately notified her supervisor, Pam Hunt. Ash Dep. at 27, Exhibit E, Pl.'s Res. Br. Lula May Robinson also testified that, upon seeing a mouse, she would notify

Hunt.  Robinson Dep. at 14, Exhibit F, Pl.'s Res. Br.  Unlike her co-workers, however, it is clear that at some point in late 2003, Plaintiff stopped executing this duty.  When reminded of her duty, Plaintiff contended that her complaints did not involve her employment and she continued to fail in executing her duty.  Thompson Dep. at 364.[5]  Moreover, instead of reporting unsanitary conditions to her supervisors, Plaintiff began secretly photographing these conditions.   It is this failure to notify her supervisors in compliance with her employment duties that led to her dismissal.

Throughout the disciplinary process leading to Plaintiff's dismissal, Aramark explained to Plaintiff that if she viewed rodent infestation in the food service area, she was required to notify her supervisor.  Haynes Dep. at 115, 146, 153, 158-59, Pl.'s Res. Br. Moreover, Haynes testified that she was permitted to voice her opinion before the school board, but was still required to comply with her duty to notify her supervisors of any problem in the food service area.  Haynes Dep. at 115-16, Ash Dep. at 18.  Following Plaintiff's second appearance before the school board she was again reminded of her duty to report unsanitary conditions to her supervisors.  Exhibit L, February 9, 2004 Letter of Reprimand Meeting Transcript, Pl.'s Res. Br. Finally, Plaintiff's suspension occurred only after Aramark learned that Plaintiff was distributing photographs, obtained in secret, of the food service

---

[5]Despite Plaintiff's protestations to the contrary, it is an inescapable conclusion that the presence of unsanitary conditions in the food service area involve her employment with Aramark, the company assigned the task of managing and providing food service for the school district.

area.[6]  Plaintiff, herself, explained that her suspension resulted from the photographs. Thompson Dep. at 493, Exhibit K-2, Def.'s Br. Summ. J.   Further, Aramark's letter explaining the suspension makes clear that her suspension resulted from her failure to comply with her duty to notify her supervisors of unsanitary conditions, not her statements to the school board.

Based on this record, it is clear to the Court that Plaintiff has failed to establish a causal connection between her dismissal and protected activity.  Essentially, Plaintiff engaged in insubordinate conduct by repeatedly disregarding her employer's instruction to alert her supervisor of any unsanitary conditions in the food service area.  Plaintiff's disregard for her employment duties, not her numerous speeches to the school board, caused the employment discipline and subsequent dismissal.  At best, Plaintiff has shown a temporal connection between her conduct and termination, but that is not sufficient to establish a prima facie case under the Whistleblowers' Protection Act.  *West*, 469 Mich. at 186, 665 N.W.2d at 472-73 ("Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed. Plaintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.") (citations omitted).

_____

   [6]It is interesting to note the timing of each disciplinary action taken against Plaintiff. In December 2003 and February 2004 she was reprimanded within a week of her public comments.  Aramark, however, did not take any action following her March 2 appearance before the school board.  Aramark only took action after discovering Plaintiff's surreptitious picture taking.

Plaintiff contends that her discharge was "at least in part motivated by her speaking out again at the March 2, 2004 Board meeting.  In addition, she would not have been in a position to be discharged had she not been disciplined on the two previous occasions."  Pl.'s Res. Br. at 16-17.  This argument is misplaced.  As the evidence above demonstrates, the disciplinary action taken against Plaintiff was not caused by her speaking to the school board. Indeed, it is undisputed that Aramark did not prohibit her from expressing her opinion in that forum.  Haynes Dep. at 115-16, Ash Dep. at 18.[7]  Rather, the disciplinary action taken against Plaintiff was a result of her failure to comply with her duty as an Aramark employee to report rodent infestation and unsanitary food conditions immediately to her supervisor.  Moreover, while Plaintiff contends that she complained constantly to her supervisors, by late 2003 she clearly turned her focus away from effectuating her duty to report food service area conditions to secretly documenting the alleged conditions.  The nature of Plaintiff's position and the environment in which she worked necessitated that she alert her supervisors to unsafe food conditions each time she discovered them.  Immediately reporting unsanitary conditions was a vital part of Plaintiff's employment and her failure to comply resulted in her dismissal. Consequently, Plaintiff cannot establish a causal connection between her protected activity and subsequent dismissal.

---

[7]Nor does it appear that Aramark discouraged employees from voicing complaints to the county health inspector.  *See* London Dep. at 84-85.  Rather Aramark's primary concern was that its employees immediately notify their supervisor of any unsanitary condition in the food service area.  Hunt Dep. at 26, Haynes at 158.

Even if Plaintiff could establish a prima facie case of retaliation, she would be unable to prevail because Aramark has articulated a legitimate, non-retaliatory reason for its actions. *James*, 852 F. Supp. at 626, *Wolcott*, 691 F. Supp. at 1058. Aramark disciplined and eventually terminated Plaintiff because she repeatedly failed to comply with her duty to report unsanitary conditions to her supervisors and, rather than report such conditions, secretly photographed the food service area. This insubordinate conduct served as a legitimate, nondiscriminatory reason for Plaintiff's termination. Moreover, Plaintiff has failed to demonstrate that Aramark was motivated by a discriminatory reason or that Aramark's legitimate reason is not worthy of credence. *See Deneau*, 219 F. Supp. 2d at 860. As stated previously, the evidence demonstrates that Plaintiff engaged in insubordinate conduct that eventually led to her dismissal.

Plaintiff has failed to establish that there is a genuine issue of material fact that requires submission to a jury. Accordingly, Aramark is entitled to summary judgment on Plaintiff's Whistleblower Protection Act claim. An order will be entered consistent with this opinion.[8]

Date:   November 8, 2005          /s/ Robert Holmes Bell
                                  ROBERT HOLMES BELL
                                  CHIEF UNITED STATES DISTRICT JUDGE

---

[8] In light of disposition of this matter, Aramark's motion to amend its Answer (Docket #70) and its motion in limine to exclude Plaintiff's expert Peggy Brady (Docket #76) are denied as moot.